(C. D. 1648)

MERCANTIL DISTRIBUIDORA, S. A. ⎫
JOSEPH H. BROWN ⎭ *v.* UNITED STATES

United States Customs Court, Third Division

(Decided October 28, 1954)

*Lawrence & Tuttle (George R. Tuttle* and *Lawrence A. Harper* of counsel); *Barnes, Richardson & Colburn,* associate counsel; for the plaintiffs.

*Warren E. Burger,* Assistant Attorney General *(Joseph E. Weil,* trial attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: These cases, consolidated at the trial, involve the classification of two shipments of boneless salted beef, one of which was imported on July 2, 1951, at the port of Laredo (protest No. 189659–K) and the other on May 29, 1951, at the port of El Paso (protest No. 187177–K). The merchandise was assessed with duty at 3 cents per pound, but not less than 20 per centum ad valorem, as meats, prepared or preserved, not specially provided for, under paragraph 706 of the Tariff Act of 1930, as modified by the trade agreement with Paraguay, T. D. 51649. It is claimed that the merchandise is meat, prepared, but not cured, and not pickled or packed in airtight containers, and is, therefore, dutiable at 3 cents per pound, but not less than 10 per centum ad valorem, under paragraph 706, as modified by the General Agreement on Tariffs and Trade, T. D. 51802.

The pertinent provisions of the tariff act, as modified, are as follows:

Paragraph 706, as modified by the trade agreement with Paraguay, T. D. 51649:

Meats, prepared or preserved, not specially provided for (except meat pastes other than liver pastes, packed in air-tight containers weighing with their contents not more than 3 ounces each), 3¢ per lb., but not less than 20% *ad valorem.*

Paragraph 706, as modified by the General Agreement on Tariffs and Trade, T. D. 51802:

Meats, prepared or preserved, not specially provided for (except beef packed in air-tight containers and pickled or cured beef or veal), 3¢ per lb., but not less than 10% ad val.

The merchandise in protest No. 189659–K is described on the consular invoice as "boneless cured cowbeef with 4.5% salt added" and on a *pro forma* invoice as "mixed meat (boneless cured beef) 60% bullmeat and 40% cowmeat." It was entered as "boneless cured beef (60% bullmeat and 40% cowmeat, mixed in barrels)." It was produced by Industria Empacadora de Tampico, S. A., of Tampico, Mexico, and imported by Mercantil Distribuidora, S. A., for the account of Walkers Austex Chili Co. of Austin, Tex. The merchandise in protest No. 187177–K is described on the consular invoice as "cured cowbeef" and was entered as "cured beef." It was produced by Empacadora de Ciudad Juarez, S. A., of Juarez, Mexico, and was imported by Joseph H. Brown for the account of Peyton Packing Co. of El Paso, Tex.

At the trial, plaintiffs called 17 witnesses and the defendant 9. Plaintiffs' witnesses included three customs officials, three customs brokers, one interpreter, one attorney, and nine men engaged in the production, transportation, distribution, or use of the imported merchandise or similar products. The Government's witnesses included one plant superintendent, three representatives of the Bureau of Animal Industry, and five customs officials. In addition, numerous documents were offered and received in evidence.

In the course of the trial, it was stipulated that the imported merchandise consisted of prepared meat. The method of preparation of the beef involved in protest No. 189659–K was described by Henry R. Hausman, who, at the time of production, had been superintendent of Industria Empacadora de Tampico, S. A. He testified: After the cattle were killed and everything removed from the carcass, the carcass was placed in a chill room for 24 hours; then it was placed in a holding cooler at a temperature of 32 to 34 degrees Fahrenheit for either 3 or 7 days. Thereafter, it was sent to the boning room, which was kept at 45 degrees. There the bones were removed and the meat cut into pieces of 5 to 16 inches in thickness and about 30 inches in length and slivers of ½ to 7 inches in length. Then, the meat was weighed and placed on tables, where a quantity of salt equal to 4½ percent of the weight of the meat was rubbed in. The salted meat was placed in 500-pound barrels, which were covered and sealed with paraffin and placed in a refrigerated room at a temperature of about 34 degrees for 21 days. Subsequently, the barrels were loaded on refrigerated trucks, having a temperature of 30 to 32 degrees, and shipped to Nuevo Laredo for exportation.

According to Fernando A. Villalobos, manager of Empacadora de Ciudad Juarez, S. A., the merchandise involved in protest No. 187177–K was similarly produced, except as follows: After the meat was boned, it was cut into pieces or strips of about 1½ or 2 inches wide and 3 or 4 inches long and placed in a mixer. Seventeen pounds of table salt to 400 pounds of meat were added, together with 1 pound of Prague powder, a preparation consisting of 6 percent sodium nitrite, 4 percent sodium nitrate, sugar dextrose, and salt. The meat and the salt and Prague powder were mixed together for 3 minutes and then packed in barrels, stored in a cooler for 5 days, and shipped.

Other witnesses described the methods of production of similar merchandise in various plants in Mexico. Such merchandise was prepared with 4 to 4½ percent salt, and some contained sodium nitrate and/or nitrite in addition. One of the witnesses added that during the period when the salted beef was held in refrigeration, the salt penetrated to the center of the product. According to the record, the purpose of adding sodium nitrate and/or nitrite to the product was to retain the red or pink color of the meat. It was not a curing agent. Its presence was said to protect against bacterial action in a limited way but not to contribute materially to the keeping quality of the product.

The reason for producing this merchandise lies in the fact that Bureau of Animal Industry Order No. 373, revision of May 7, 1951 (9 CFR, part 94), had designated Mexico as one of the countries in which rinderpest or foot-and-mouth disease existed and had provided (sec. 94.4):

(a) The importation of cured meats derived from ruminants or swine, originating in any country designated in § 94.1 is prohibited unless the following conditions have been fulfilled:

(1) All bones shall have been completely removed in the country of origin.

(2) The meat shall have been held in an unfrozen, fresh condition for at least 7 days immediately following the slaughter of the animals from which it was derived.

(3) The meat shall have been thoroughly cured by the application of dry salt or by soaking in a solution of salt.

(4) When so directed by the Chief of the Bureau of Animal Industry, such meat shall be consigned directly from the port of entry to a meat-processing establishment operating under Federal meat inspection that has been approved by him for the further processing of such meat. Such meat shall be shipped from the port of entry to the approved establishment under Customs seals or seals of the Bureau and shall be otherwise handled as the said Chief of Bureau may direct. Seals applied under authority of this section shall not be broken except by persons authorized to do so by the said Chief of Bureau.

Although there is nothing in the regulations as to the particular percentage of salt to be used, apparently 4 to 4½ percent was acceptable, since merchandise containing that amount was permitted entry.

According to testimony herein, the embargo on the importation of meat from Mexico ended on September 1, 1952, and, thereafter, meat containing 2 percent salt, or no salt, was imported.

Other regulations were issued providing for the inspection of the merchandise at the approved meat-processing establishment to which it was consigned and setting out the method of processing required (plaintiffs' collective exhibit 1). The purpose of the regulations, according to witnesses connected with the Federal Meat Inspection Division, was to reduce the possibility of infection through the foot-and-mouth disease virus. It was stated that the virus remains longer in the bones; therefore, they had to be removed. Salt was used because, in the opinion of some men in the department, it retards the growth of the virus. Airtight containers and transportation under seal are required to prevent the spread of the virus, if present.

John W. Lewis, customs broker at Laredo, testified that he had seen merchandise of this type when it arrived in this country and that the barrels are examined by a Bureau of Animal Industry inspector to see if they are leaking. If so, they are repaired, or, in some instances, returned to Mexico. After inspection, the barrels are loaded onto American trucks for shipment to their destination, in this case (protest No. 189659–K), the Walkers Austex Chili Co. at Austin, Tex.

Lee Roy Johnson, purchasing agent and assistant production manager of that company, testified that when meat arrives at the plant the Bureau of Animal Industry inspector examines it to see if it is in good condition. After it is approved, it is unloaded and put in the cooler room, which is kept at a temperature of 38 to 40 degrees. It is then moved to the kitchen, as required, and the meat is ground and used in the manufacture of meat products. During all this time and until the product is shipped out of the plant, it is under the supervision of the Bureau of Animal Industry inspector.

According to the record, this type of merchandise is used in the production of meat products, such as beef stew, chili with or without beans, tamales, spaghetti and meat balls, sausage, bologna, frankfurters, and loaf meats. In making some of these products, additional salt is used; in others, no salt is added; and, in still others, domestic unsalted beef has to be used with the imported meat in order to counteract the amount of salt in the latter.

There was considerable evidence to show that this type of merchandise was described in invoices and entries and other documents as cured beef. For instance, Mr. Hausman testified that he had instructed the auditor, Mr. Becerra, to describe the merchandise on the consular invoices as boneless cured beef. The reason for this, he said, was that he had been told that unless the merchandise was billed as cured beef, it would not be allowed entry into the United States.

Customs broker Lewis testified that he filed the entry of the merchandise in protest No. 189659–K and had the merchandise described

as boneless, cured beef, because of instructions he had received and because Bureau of Animal Industry regulations provided that only cured beef could be imported.

Ralph Valls, another customs broker at Laredo, testified that meat with 4 to 4½ percent salt was invoiced as salted cow meat or bull meat, or as cured cow meat or bull meat. He entered such merchandise as salted beef and as cured beef, respectively. Some entries, made in 1951, used the term "salt-cured beef." In a letter of his, dated December 18, 1951 (defendant's collective exhibit O), he said: "Reference is made to the movement of cured meat being handled by me for Ready Foods de Mexico." He testified that such merchandise was the same type of product as that before the court.

Clyde P. Kassens, vice president and secretary of Ready Foods Canning Co., which is affiliated with Ready Foods de Mexico, explained that in using the term "cured" in a letter to the appraiser at Laredo (defendant's collective exhibit E) he did not use it in the sense of meat that had been cured by a salt process. In a letter to Mr. Valls (defendant's collective exhibit O), he said:

We note that you say that meat importations are new, which causes a valuation problem. Actually, it is new only in that it is boneless meat, whereas the live cattle were formerly shipped across the border. The product is simply boneless cow meat with cure added to meet the Bureau of Animal Industry regulations.

In another letter (defendant's exhibit U), Mr. Kassens said:

You asked about the curing process. Boneless meat is put in barrels, after cure is added and is retained at the plant until the cure has completely penetrated the meat. It takes about two weeks for this curing process.

As I told you in my other letter of today, the curing process is required by the B. A. I. for the meat to be imported from Mexico, to protect against the possible spread of foot and mouth disease. The process does not add, but rather decreases the value of the meat.

Other documentary evidence in which salted beef, that is, merchandise such as or similar to that before the court, was referred to as cured beef or as cured meat was offered and received in evidence. Included are a portion of a contract of sale, letters, orders, confirmations of orders, labels, and official papers (defendant's exhibits A, B, C, D, F, J, K, Q, R, S, T, and plaintiffs' exhibits 5, 7, and 13). The merchandise was also called salted cow meat (defendant's collective exhibit P), and, according to Mr. Villalobos, some of the orders in his files contained the word "cured" and some did not (plaintiffs' collective exhibits 11 and 12).

Walter G. Hoffman, chief liquidator at the port of Laredo, testified that the fact that the merchandise was described on some of the invoices and entries as salted beef did not deceive him as to the character of the goods, since he had been fully informed about the merchandise and the process of production by representatives of the importers.

During the course of the trial, there was received in evidence a meat inspection certificate, issued by a department of the Mexican Government, in connection with the importation involved in protest No. 189659–K. As translated at the trial, it states, among other things, that the meat was carefully and completely cured.

Evidence was also offered in regard to the keeping qualities of salted beef. Estimates were given by a number of witnesses as to how long it could be retained without refrigeration. According to all but one of the witnesses, that period was from 1½ to 8 days.

For instance, Lloyd E. Berry, a meat packer of San Antonio, testified that fresh boneless beef and boneless beef containing up to 4 percent salt would keep from 36 to 72 hours at a temperature above 36 or 38 degrees Fahrenheit. The witness Kassens of Ready Foods Canning Co. stated that unsalted, unchilled beef would keep in the temperature of Laredo for about 24 hours, and beef containing 4 percent salt would last from 48 to 56 hours. Walter J. Dill, who had been plant superintendent of several meatpacking plants, testified that unsalted beef would keep in a temperature above the normal chill temperature for 3 days, while salted beef would last 5 days. George R. Gilman, manager of a meat-producing plant at Cananea, Mexico, stated that unsalted beef would keep at temperatures of 45, 50, and 60 degrees for 2 to 4 days and that the addition of 4½ percent salt would increase the time from 3 to 8 days. John N. Phillips, plant superintendent of Peyton Packing Co., testified that unsalted meat would not last out of refrigeration longer than a period of 2 or 3 days and that salted meat would keep for 4 to 6 days. On the other hand, one of defendant's witnesses, Dr. Callaway, estimated that salted meat, which arrived under refrigeration at 36 degrees and was then placed in a temperature of 50 degrees, would keep about 30 days and that, if such meat were put into a temperature of 70 degrees, the time would be reduced to 20 days.

The record shows, in addition, that care was taken to keep this type of merchandise at low temperatures during processing and transportation. The beef carcasses, while they were held at the plants, were kept at temperatures of 32 to 38 degrees. While the temperature in the boning rooms was higher, the meat was kept there for as short a time as possible. Furthermore, the temperature in the holding rooms, where the merchandise was stored, and in the trucks and railway cars, in which it was shipped, ranged from 30 to 38 degrees.

Nevertheless, according to the record, this type of merchandise deteriorated under circumstances such as those described by the following witnesses: Plaintiffs' witness Hausman stated that salted meat, which had been left standing at room temperature, about 90 degrees, for 30 to 40 minutes before being placed in refrigeration, was later found to be gaseous and condemned, and that this also happened

where barrels of salted meat were left overnight in the boning room at a temperature of 45 degrees. Several other witnesses gave similar testimony. For example, Lee Roy Johnson of Walkers Austex Chili Co. cited an instance where meat which had been kept in a storage room at 38 to 45 degrees for 3 to 4 days began to spoil and some had to be discarded. Plant superintendent Dill referred to an incident when some railway cars were kept at El Paso for 4 days and the temperature in them rose to 50 degrees. Although they were then removed to a warehouse and kept at a temperature of 20 to 25 degrees, the meat was found to be spoiled when it was subsequently sent to its destination. The meat packer, Mr. Berry, and Paul J. Luther, plant superintendent of Empacadora Trevino, a producer of salted beef, both described instances in which merchandise was lost due to failure of refrigeration. Joseph H. Brown, customs broker at El Paso, testified that salted beef was on a number of occasions found spoiled on arrival at its destination, although in good condition when it left El Paso and although the regular icing instructions had been given to the carriers.

There was considerable evidence introduced as to the meaning of the term "cured" and as to whether this merchandise actually was "cured." Two meanings were ascribed to the word "cured," expressed by witness Gilman, meat production manager, as follows:

The word "cured" apparently has several interpretations. One is that it is actually cured against spoilage. Another term in the packing house trade as to whether the additives have penetrated the product and means nothing more than that. In that case, if your additives were strong enough, and it had fully permeated the product, it would then be cured, but it wouldn't necessarily preserve it and keep it from spoiling.

In the opinion of plaintiffs' witnesses, the use of 4½ percent salt was not sufficient to cure beef because, as the above-mentioned testimony shows, such beef spoils when taken out from under refrigeration or subjected to a change in temperature in refrigeration.

For instance, the witness Johnson stated that in his opinion the use of 4½ percent salt was not enough to cure beef. He added that his firm was not interested in "cured" beef, and, in fact, could not have used beef that had been so treated as to be permanently preserved.

The witness Kassens of Ready Foods Canning Co. testified that a real salt-cured beef would not spoil for a considerable time. The product he had in mind was beef packed in airtight barrels with a very heavy proportion of salt, which is shipped into very hot or torrid zones. He did not believe that beef with 4 percent salt was cured beef.

Plant superintendent Luther said that beef could not possibly be thoroughly cured with 4 to 4½ percent salt. He added that it made no difference what it was called; it could not be cured beef because meat cannot be cured with 4 percent salt.

According to witness Berry, boneless beef with 4½ percent salt is not cured, because if it were, it would not spoil. He said that the beef herein, even though called thoroughly cured by the Bureau of Animal Industry, will spoil in certain temperatures. By way of illustration of a cured product, he referred to Smithfield ham, which he stated he has kept several weeks without refrigeration.

Merchandise which these witnesses considered cured beef included beef packed in airtight barrels with a heavy proportion of salt; dried beef, also known as jerky or tasajo; and chipped beef. Jerky or tasajo was described as dried beef in pieces, 5 or 6 feet long, 4 feet wide, and a couple of inches thick, not salted, and without bones. Chipped beef was explained to be a product made by immersing the meat in 15 to 25 percent brine for 90 to 120 days, and then smoking and slicing it. According to the witnesses, those products would keep a long time without refrigeration.

On the other hand, defendant's witnesses considered beef to be cured when it had been subjected to the action of salt in such proportions and under such circumstances that it would permeate the beef. They said that evidence that beef has been cured is found in the penetration of the salt to the inside of the meat, in the color and firmness of the meat, and in its binding quality. If it has high, soggy spots in the center, the curing agent has not penetrated and the meat is uncured. In their view, curing retards decomposition, so that the meat will keep for a somewhat longer time than fresh meat, without a low degree of refrigeration. For instance, Dr. Coleman P. Callaway, a veterinarian in the Meat Inspection Service of the Bureau of Animal Industry, stated that meat is cured when the added salt has the effect of extending its life from 48 hours to 96 hours. Another witness, Dr. Albert R. Miller, assistant chief of the Bureau of Animal Industry, in charge of the meat inspection service, stated that longer curing methods and higher salt penetration would give a greater degree of stability to the product. In his view, however, the primary purpose of curing was to give to the product the taste and color to which the consumer had become accustomed.

Dr. Miller said that salted beef imported from Mexico was required by the Bureau of Animal Industry to be labeled as "cured." For the purpose of the labeling regulation, he explained, meat is cured when a significant quantity of salt has been applied to the meat and it has permeated it so as to affect its character. While it is common practice to ship carcass meat in the United States with from 1½ to 2 percent salt added, such meat is not labeled "cured," because the salt has not permeated it. On the other hand, beef with 4 percent salt was required to be labeled "cured" in establishments operating under Federal Meat Inspection in January 1948. According to the witness' knowledge, such a product was handled in 1948 by the

Isaac Gellis concern in New York City, where it was used as a substitute for pork in preparing a kosher product, consisting of beans and beef.

Dr. Callaway referred to a type of boneless beef with 4 to 4½ percent salt which he had inspected from 1931 to 1941 in the packing plants of Swift & Co. and Armour & Co. in Fort Worth. He explained that years ago all beef and pork was ground and mixed with salt and curing spices, placed in pans for 3 to 5 days, and held at a cool temperature in a room, called the cure room, until thoroughly cured. It was then used in the manufacture of sausage and sausage products.

Dr. Miller placed under the heading of cured beef, corned beef, barreled or mess beef, plate beef, India beef, beef hams, and the beef used in meat products, such as corned beef hash, beans and beef, pure beef sausage and frankfurters, spiced and smoked beef, pastrami, and beef roll. He stated that corned beef is cured, if the salt has penetrated, but it will not keep without refrigeration.

Dr. Miller also testified that preserved meat is that class of meat that has been subjected to a form of treatment that will give it considerable stability. The usual method is freezing, and there is also canning, pickling with vinegar, and drying to an advanced degree. Beef which has been subjected to a process in which 4 percent salt is added is not preserved meat.

According to the witness, dried cured beef, such as chipped beef, gets its stability from the drying more than from the cure. Moreover, dried meats are not necessarily cured meats. In his view, products known as jerky, xarque, carne seca, which are sometimes prepared without salt, are not cured beef.

John N. Phillips, plant superintendent of Peyton Packing Co., meat packer and processor, testified that his firm bought cured beef in barrels for use in the manufacture of sausage. It was purchased as boneless beef and, in his opinion, was cured beef. In his view, any meat which has been salted, or treated with a combination of salt and nitrate and nitrite, or either, is cured meat. Mr. Phillips stated that the imported merchandise (protest No. 187177–K) was used by his firm together with domestic beef and pork in the manufacture of meat products and was under the jurisdiction of the Bureau of Animal Industry until the final product was processed. He testified that his firm has sold cured beef and that it was labeled as such, but that when cured beef was one of the ingredients in meat products, it was listed as "beef," not as "cured beef," on the labels.

The question before us is whether this merchandise is "cured beef" within the meaning of the exception in paragraph 706 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, and, consequently, not entitled to the reduced rate provided therein.

According to the record, this merchandise consists of small pieces of beef containing 4 to 4½ percent salt which has permeated throughout the meat. In some cases, sodium nitrate and/or nitrite was used in addition to the salt, principally for color fixation. The effect of the salt was to extend the time during which such beef could be kept without refrigeration, but it would not remain unspoiled indefinitely except at low temperatures. The longest estimated time given by any of the witnesses was 30 days, but, in the actual incidents described, such merchandise deteriorated in a much shorter time when there was a failure of refrigeration.

The issue devolves around the meaning of the term "cured beef" in the trade agreement cited. Since there has been no proof of commercial designation, the common meaning, which is presumed to be the same as the commercial meaning, is controlling. *Bakelite Corporation et al.* v. *United States*, 16 Ct. Cust. Appls. 378, T. D. 43117; *August Bentkamp* v. *United States*, 40 C. C. P. A. (Customs) 70, C. A. D. 500. While common meaning is a question of law to be determined by the court, evidence tending to prove such meaning may be received and considered by the court, and it may refresh its knowledge by consulting dictionaries, lexicons, and other written authorities. *United States* v. *John B. Stetson Co.*, 21 C. C. P. A. (Customs) 3, T. D. 46319; *United States* v. *Florea & Co., Inc.*, 25 C. C. P.A. (Customs) 292, T. D. 49396; *Stephen Rug Mills* v. *United States*, 32 C. C. P. A. (Customs) 110, C. A. D. 293.

The Government's contention that the merchandise is cured beef appears to rest primarily upon the fact that it was referred to as cured beef in the invoices and entries herein and in many other documents. While such statements may be admissions against interest, they establish no more than a *prima facie* case against any contradictory claim made by the importers. They do not act as an estoppel nor preclude the parties from showing the true character of the goods. *United States* v. *Paul Puttmann*, 21 C. C. P. A. (Customs) 135, T. D. 46466; *United States* v. *Wo Kee & Co.*, 21 C. C. P. A. (Customs) 341, T. D. 46880; *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. (Customs) 441, T. D. 48902.

In the instant case, it was explained that the term "cured beef" was used with reference to this merchandise because of the Bureau of Animal Industry regulations. However, the importers did not consider it to be cured beef, and, under the decisions cited, they were not precluded from showing what the merchandise actually was. Whether it was "cured beef," as that term is commonly understood, is a matter to be determined by the court. *United States* v. *Macy & Co.*, 7 Ct. Cust. Appls. 8, T. D. 36256; *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 C. C. P. A. (Customs) 24, 30, C. A. D. 209.

The Government also relies upon the Bureau of Animal Industry regulations, which prohibited the entry of beef from Mexico, unless

it was thoroughly cured by the application of dry salt. Under these regulations, beef permeated with 4 to 4½ percent salt was accepted as "cured." The defendant points out that standards established by the Department of Agriculture have been held pertinent to the determination of the identity of products. *Transcontinental Seed, Inc.*, and *Alltransport, Inc.* v. *United States*, 29 Cust. Ct. 163, C. D. 1462; *Gallagher & Ascher Co.* v. *United States*, 24 Cust. Ct. 1, C. D. 1199, and cases there cited. However, the Bureau of Animal Industry did not create a standard identifying cured beef, but prescribed the way in which beef must be treated to be allowed entry from a country where hoof-and-mouth disease existed. It did not, for instance, designate the amount of salt required for curing beef. Cured beef cannot be identified by the Bureau of Animal Industry regulations; rather, the definition intended by the Bureau must be inferred from the type of merchandise that was permitted entry. This is not establishing a standard. *Federal Security Administrator* v. *Quaker Oats Co.*, 318 U. S. 218, 232.

Regulations by the Department of Agriculture are not controlling in customs cases in all circumstances. In *F. W. Myers & Co., Inc.* v. *United States*, 29 C. C. P. A. (Customs) 30, C. A. D. 167, frozen beef livers, imported for medicinal purposes, were permitted entry by the Bureau of Animal Industry, without the inspection required of food products. However, the court found them to be of the same class and kind as beef liver consumed as meat in the United States and classified them as frozen meats, rather than as crude drugs.

In *Merck & Co.* v. *United States*, 24 Treas. Dec. 824, T. D. 33463, coffee, from which 80 percent of the caffein had been extracted, was classified as coffee, even though the Secretary of Agriculture had ruled that it could not be sold as such. The court said (p. 825):

* * * It is not our province to construe the food and drugs law, but we can readily see how under the administration of that law a different rule might be applied than that which is required in administering and construing the customs laws.

Here, the Bureau of Animal Industry regulation was directed toward a specific purpose, and requirements were laid down with that purpose in mind. Terms in customs laws, however, are construed in accordance with their common meaning, in the absence of proof of commercial designation or of a contrary legislative intent. Therefore, a definition used by the Bureau of Animal Industry which differs from the common meaning of a term is not controlling.

The testimony herein brings out two meanings for the term "cured," as used in reference to meat. The first, given by plaintiffs' witnesses, is that "cured" meat is meat which has been so treated that it will keep indefinitely without refrigeration. Several examples were given, such as chipped beef; dried beef, also known as jerky or tasajo; and beef, packed in airtight barrels with a heavy proportion of salt.

The second meaning, stated chiefly by defendant's witnesses, is that beef is "cured" when salt has penetrated throughout the meat. In their opinion, curing with salt is a process used primarily for flavoring purposes and not to provide stability.

The second meaning is apparently the one adopted by the Bureau of Animal Industry in permitting entry to the within merchandise under the regulations requiring it to be "thoroughly cured." According to Dr. Miller, that was also the definition used in connection with labeling requirements.

The two meanings were also brought out in quotations from a book entitled "Meat Hygiene" (1951) by the witness Miller, read into the record at the trial:

Curing. The salting of meats was done primarily to preserve them. Long before the development of the meat packing industry, meats were treated with salt solutions or packed in salt to keep them from spoiling so that they might be held for use at a later date. It was the common practice to salt meat produced during cold weather to hold it over for use in warmer seasons. * * *

The consumer has developed a taste for salted meat and the modern meat curing practices of the meat packing industry are aimed more at supplying the consumer with a product to satisfy his taste than a meat that has been salted for its preservation.

See, to the same effect, Encyclopedia of Chemical Technology (1952), volume 8, page 829.

Dictionaries, for the most part, define the word "cure" (insofar as meat is concerned) as meaning to preserve:

To put through a preserving process, as by salting, smoking, etc., or by drying; as, to cure hams; the grass must be thoroughly cured. [Funk & Wagnalls New Standard Dictionary (1942 edition).]

* * * to prepare (meat, fish, etc.) for preservation, by salting, drying, etc. [The New Century Dictionary (1946 edition).]

To prepare for keeping; to preserve, as by drying, salting, etc.; as, to cure beef or fish; to cure hay. [Webster's New International Dictionary (1930 edition).]

Note, however, that in subsequent editions, Webster's New International Dictionary contains the following under "cure":

To prepare for keeping or use; to preserve, as by drying, salting, etc.; * * * . [Italics supplied.]

Definitions from a number of additional authorities are listed in plaintiffs' brief. All of these are to the effect that to cure means to preserve.

The Encyclopaedia Britannica (1947 edition), volume 15, page 146, contains the following statement:

Much pork and a few beef items are cured with salt, sugar, nitrate or nitrite, and wood smoke. Cured pork keeps relatively well. * * *

In an article in The Encyclopedia Americana (1953 edition), volume 18, pages 494–495, it is stated:

Curing.—Just as primitive man discovered that his meat would keep longer in chilly weather, he probably discovered that prolonged soaking in salt water had a preservative effect. Chilling and salt-curing are still the most extensively used methods for maintaining or improving the keeping qualities of meat.

In describing curing methods, the article also states that "* * * the salt gradually penetrates and preserves the meat."

In *Florida Packing & Ice Co.* v. *Carney*, 51 Fla. 190, 41 So. 190 (1906), in a case involving the construction of a statute imposing a tax on wholesale dealers in fresh meats, packed or refrigerated, the court said (p. 192):

* * * Meats technically known as "cured," from having been treated with salt, smoke, etc., keep in an edible condition indefinitely even in the warmest latitudes, whereas the same meats when untreated and fresh, though capable of being kept in their fresh and natural condition for long periods in a low temperature either natural or artificial, quickly spoil, become putrid, and unfit for use when subjected to high or even mean or ordinary temperatures.

In *Commonwealth* v. *Clark*, 344 Pa. 155, 25 A. 2d 143 (1942), in a case involving a mercantile license tax, the court pointed out that it was common knowledge that meats, unless cured, would start to decay and spoil in 24 to 48 hours or less, and stated:

* * * "Curing", as employed in the trade of meat packing, is the permanent halting, not a mere temporary suspension, of the destructive processes of nature.

See also *Commonwealth* v. *Fried & Reineman Packing Co.*, 198 A. 801 (Pa. 1938), where the court said (p. 802):

We think it must be agreed that preserving, or keeping, is an essential result of curing. Whatever may be the change in color or flavor of certain articles which are spoken of as "cured," there is always the purpose in mind that the process shall preserve the substance from decay and deterioration. This meaning runs through all the dictionary definitions which have been referred to.

It seems clear that "to preserve" is the older and more common meaning of the word "cure," as used in connection with meat. That this was the meaning intended by the negotiators of the General Agreement on Tariffs and Trade, T. D. 51802, is indicated by the following statement in Summaries of Tariff Information, 1948, volume 7, part 1, page 70:

Pickled and cured beef is made from cuts of meat less readily "boned out" for sausage, and is put up in barrels for use *where refrigerated storage is lacking.* [Italics supplied.]

Reference was also made to the fact that importations of pickled and cured beef increased during and after World War II due to larger shipments to Puerto Rico, where duty-free entry was permitted as an emergency measure because of reduced deliveries of low-priced Canadian fish.

Duty-free entries were authorized by a Presidential proclamation, dated April 1, 1942, T. D. 50599, permitting the importation of jerk beef free of duty for sale or distribution to consumers in Puerto Rico.

In the instant case, Gabriel Ornes, who had been an examiner at San Juan, Puerto Rico, from 1941 to 1943, described such merchandise as dried boneless beef, without salt, which would keep for a long time without refrigeration.

The duty on prepared or preserved meats, as provided in the Tariff Act of 1930, was reduced by the trade agreement with Argentina, T. D. 50504, in 1941, and later by the trade agreements with Uruguay, T. D. 50786 (1942), and Paraguay, T. D. 51649 (1947). The digest of trade data, issued in connection with the agreement with Argentina, contains the following (p. 75):

Under the category of beef and veal, pickled or cured, the chief product is beef pickled or cured in salt or brine so that it may be kept for a long time with little or no refrigeration. It is a cheap meat used especially for supplying ships, construction camps, and other places where refrigeration is inadequate or wholly lacking. Dried, sliced, or smoked beef is also included in this category.

We conclude that the term meat or beef, "cured," commonly, and as used in trade agreements, refers to meat which has been preserved so that it will keep for a long time without refrigeration. It is inconceivable that a period of from 1½ to 8 days could by any stretch of the imagination be called a "long time." Only one of the Government's many witnesses, and none of plaintiffs' witnesses, estimated that this type of merchandise would keep for a longer period.

The word "preserved," as used in tariff statutes, means merchandise which has been so processed that its preservation is of a permanent and not a transitory character. *Hansen v. United States*, 1 Ct. Cust. Appls. 1, T. D. 30769; *Moscahlades Bros. v. United States*, 6 Ct. Cust. Appls. 399, T. D. 35973; *United States v. Conkey & Co.*, 12 Ct. Cust. Appls. 552, T. D. 40783; *Frosted Fruit Products Co. v. United States*, 18 Cust. Ct. 119, C. D. 1054.

Since the merchandise involved herein has not been so processed as to be permanently preserved, it is not "preserved" within the meaning of tariff statutes, nor is it "cured" within the common meaning of that term. In our view, such merchandise, which would keep no more than a few days without refrigeration, is not "cured," even though it has been permitted entry under a Bureau of Animal Industry regulation providing that it must be "thoroughly cured."

We hold, therefore, that the merchandise involved herein is prepared meat, but it is not "cured beef," as that term is commonly understood. Consequently, it does not fall within the exception in paragraph 706 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, and is properly dutiable under said paragraph, as modified, at 3 cents per pound, but not less than 10 per centum ad valorem, as meat, prepared, not specially provided for.

The protests are sustained and judgment will be rendered for the plaintiffs.