UNITED STATES *v.* MERCANTIL DISTRIBUIDORA, S. A., JOSEPH H. BROWN (No. 4837)[1]

---

[1] C. A. D. 617.

United States Court of Customs and Patent Appeals, April 18, 1956

*Warren E. Burger*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Joseph E. Weil*, trial attorney, of counsel), for the United States.
  *Lawrence & Tuttle* and *Barnes, Richardson & Colburn* (*Joseph Schwartz*, *Lawrence A. Harper*, and *George R. Tuttle* of counsel) for appellees.

[Oral argument December 6, 1955, by Mr. FitzGibbon and Mr. Tuttle]

Before O'CONNELL, Acting Chief Judge, and JOHNSON, WORLEY, COLE, and JACKSON (retired), Associate Judges

COLE, Judge, delivered the opinion of the court:

This case involves the question of the meaning of the term "cured beef" as it is used in the General Agreement on Tariffs and Trade, T. D. 51802, modifying paragraph 706 of the Tariff Act of 1930. Specifically, the question is whether the imported merchandise—beef strips and pieces treated with 4 to 4½ per cent salt but not preserved sufficiently to eliminate the need for refrigeration—is "cured beef" so as to except it from the lower rates of duty provided for in the General Agreement.

Two protests are involved here, which were consolidated at the trial below. Although the merchandise covered by each protest differs somewhat in the details of its preparation from that of the other, the issues presented are substantially the same.

In each case, the collector assessed the merchandise with duty at 3 cents per pound, but not less than 20 per centum ad valorem, as meats, prepared or preserved, not specially provided for, under paragraph 706 as modified by the trade agreement with Paraguay, T. D. 51649. Upon appeal, the Customs Court in its decision, 33 Cust. Ct. 158, C. D. 1648, held that the merchandise was dutiable at 3 cents per pound, but not less than 10 per centum ad valorem, under paragraph 706 as modified by the General Agreement. The Government appeals from that decision.

The involved statutory and trade agreement provisions are as follows:

(1) Tariff Act of 1930:

    Par. 706. Meats, fresh, chilled, frozen, prepared, or preserved, not specially provided for, 6 cents per pound, but not less than 20 per centum ad valorem.

(2) Trade Agreement with Paraguay:

| | |
|---|---|
| 706 Meats, prepared or preserved, not specially provided for (except meat pastes other than liver pastes, packed in air-tight containers weighing with their contents not more than 3 ounces each). | 3¢ per lb., but not less than 20% ad valorem. |

(3) General Agreement on Tariffs and Trade:

| | |
|---|---|
| 706 Edible animal livers, kidneys, tongues, hearts, sweetbreads, tripe, and brains, fresh, chilled, or frozen. | 1½¢ per lb., but not less than 7½% ad val. |
| 706 Meats, prepared or preserved, not specially provided for (except beef packed in air-tight containers and pickled or cured beef or veal). | 3¢ per lb., but not less than 10% ad val. |

It is stipulated that the involved merchandise is prepared meat, and there seems to be no claim that it is either packed in air-tight containers or that it is pickled. Thus, if it is not "cured beef" it is dutiable under the General Agreement at a minimum of 10% ad valorem as was found by the Customs Court, but if it *is* "cured beef" then it is dutiable at a

minimum of 20% ad valorem under the Trade Agreement with Paraguay as found by the collector.

The merchandise involved in each protest was succinctly described in the decision of the lower court:

* * * The method of preparation of the beef involved in [the first protest] was described by Henry R. Hausman, who, at the time of production, had been superintendent of Industria Empacadora de Tampico, S. A. He testified: After the cattle were killed and everything removed from the carcass, the carcass was placed in a chill room for 24 hours; then it was placed in a holding cooler at a temperature of 32 to 34 degrees Fahrenheit for either 3 or 7 days. Thereafter, it was sent to the boning room, which was kept at 45 degrees. There the bones were removed and the meat cut into pieces of 5 to 16 inches in thickness and about 30 inches in length and slivers of ½ to 7 inches in length. Then, the meat was weighed and placed on tables, where a quantity of salt equal to 4½ percent of the weight of the meat was rubbed in. The salted meat was placed in 500-pound barrels, which were covered and sealed with paraffin and placed in a refrigerated room at a temperature of about 34 degrees for 21 days. Subsequently, the barrels were loaded on refrigerated trucks, having a temperature of 30 to 32 degrees, and shipped to Nuevo Laredo for exportation.

* * * [T]he merchandise involved in [the second protest] was similarly produced, except as follows: After the meat was boned, it was cut into pieces or strips of about 1½ or 2 inches wide and 3 to 4 inches long and placed in a mixer. Seventeen pounds of table salt to 400 pounds of meat were added, together with 1 pound of Prague powder, a preparation consisting of 6 percent sodium nitrite, 4 percent sodium nitrate, sugar dextrose, and salt. The meat and the salt and Prague powder were mixed together for 3 minutes and then packed in barrels, stored in a cooler for 5 days, and shipped.

It was amply established by the extensive testimony in the record, and was found by the court below, that merchandise of the type imported would not keep more than a few days without refrigeration, although it would keep somewhat longer than unsalted or fresh meat under the same conditions.

The contention of appellee before the court below and before this court is that the term "cured beef" means beef which has been preserved by a curing process so that it will keep a substantial length of time without refrigeration, and that the imported merchandise does not fit this description. The appellant contends that "cured beef" means beef which has been subjected to a curing process so that the salt (or other curing agent) has penetrated the meat, and does not require that the product be so preserved as to keep for prolonged periods at normal temperatures.

Thus, the basic issue in this case is clearly drawn: Does the term "cured beef" as used in the General Agreement refer to beef which has been *preserved* by a curing process? Or does it refer to beef which has been *permeated* (though not necessarily "preserved") by a curing agent?

In order to resolve this issue, it is necessary first to understand some of the background of this case. The meat involved here was

imported from Mexico, which is a country which has had outbreaks of the devastating foot and mouth disease. Section 306 of the Tariff Act of 1930 provides:

(a) Rinderpest and Foot-and-Mouth Disease.—If the Secretary of Agriculture determines that rinderpest or foot-and-mouth disease exists in any foreign country, he shall officially notify the Secretary of the Treasury and give public notice thereof, and thereafter, and until the Secretary of Agriculture gives notice in a similar manner that such disease no longer exists in such foreign country, the importation into the United States of cattle, sheep, or other domestic ruminants, or swine, or of fresh, chilled, or frozen beef, veal, mutton, lamb, or pork, from such foreign country, is prohibited.

\* \* \* \* \* \* \*

(c) Regulations.—The Secretary of Agriculture is authorized to make rules and regulations to carry out the purposes of this section, \* \* \*

Mexico, the country from which the involved merchandise was exported, was designated as one of the countries in which rinderpest or foot-and-mouth disease existed by Bureau of Animal Industry (hereinafter referred to as BAI) order number 373 as amended (9 CFR 94.1). The same regulation (see 9 CFR 94.4), pursuant to section 306 (c), *supra*, prescribed rules for the importation of meats from such countries. The regulations effective when the involved importations were made on May 29, 1951, and July 2, 1951, read as follows (16 F. R. 2955):

§ 94.4 *Foreign cured or cooked meats from countries where rinderpest or foot-and-mouth disease exists.* (a) The importation of *cured meats* derived from ruminants or swine, originating in any country designated in § 94.1 is prohibited unless the following conditions have been fulfilled:

(1) All bones shall have been completely removed in the country of origin.

(2) The meat shall have been held in an unfrozen, fresh condition for at least 7 days immediately following the slaughter of the animals from which it was derived.

(3) *The meat shall have been thoroughly cured by the application of dry salt or by soaking in a solution of salt.*

(4) When so directed by the Chief of the Bureau of Animal Industry, such meat shall be consigned directly from the port of entry to a meat-processing establishment operating under Federal meat inspection that has been approved by him for the further processing of such meat. Such meat shall be shipped from the port of entry to the approved establishment under Customs seals or seals of the Bureau and shall be otherwise handled as the said Chief of Bureau may direct. Seals applied under authority of this section shall not be broken except by persons authorized to do so by the said Chief of Bureau. [Italics added]

\* \* \* \* \* \* \*

Since the meat involved here was passed by the government inspectors charged with enforcing the above regulation, the obvious assumption is that they did their duty, and that this meat was "thoroughly cured" within the meaning of the regulation. Indeed, two of the inspectors who actually inspected the meat testified affirmatively that it met the requirement of being "thoroughly cured."

It is apparent from their testimony, and from the testimony of other witnesses, that "thoroughly cured" as used in the regulation was construed to mean—not that the meat was preserved—but that the curing agent had permeated the meat.

In passing, it should be pointed out that undue significance should not be attached to the word "thoroughly" as it appears in the regulation. Government's witness, Dr. Miller, Chief of the Meat Inspection Service of the Department of Agriculture, testified that to him " 'thoroughly cured' and 'cured' would mean the same thing" and the testimony of other witnesses charged with enforcing the BAI regulation is of like effect. Thus it appears that "cured" or "thoroughly cured" as used in the BAI regulation meant no more than that the curing agent had completely permeated the meat, which, apparently, was sufficient treatment (with the other steps) to protect against transmission of foot and mouth disease.

If this court were to be bound by the interpretation of the Bureau of Animal Industry as to the meaning of "cured," we would, of course, have to find for the Government, and reverse the holding of the court below. However, the claim that the meaning of the regulation would be binding upon this court in determining tariff usage was correctly rejected by the court below, citing *F. W. Myers & Co., Inc.* v. *United States*, 29 C. C. P. A. (Customs) 30, C. A. D. 167, to the effect that a Department of Agriculture regulation does not bind this court in its determination of the meaning of words for tariff purposes. Government counsel does not attempt to urge here that the BAI regulation does have binding effect. Certainly, it is entirely conceivable that a word with more than one meaning might be used in one sense in a regulation of the Agriculture Department, and in another sense in the Customs Laws. Unless the tariff term should be shown to have been drafted with reference to the regulation, this court cannot avoid its duty of inquiring into the meaning intended for tariff purposes, which may or may not have been the same as that of the regulation.

Another aspect of the case is the fact that the goods involved here were invoiced as "cured beef," and in addition were frequently so described in correspondence and other documents by importers or their agents, exporters, sellers and purchasers. Although appellant in its assignments of error states that these statements "conclusively" established that the goods were cured beef, it has retreated from that position somewhat in its brief, and argues that they were admissible as admissions against interest, and that they would have established a *prima facie* case against importers. That is undoubtedly a correct statement of the law, but it is of little help here. It is not disputed that the statements were admissible for whatever they are worth, and the time when a *prima facie* showing would have sufficed has long since passed. It was testified by importers' witnesses that

meat of the character involved here was referred to as "cured beef" solely to conform to the BAI usage of that term, and such usage did not indicate what the parties thought the merchandise was in either the ordinary or the tariff usage. The lower court held that such explanation was sufficient to overcome Government's *prima facie* showing, and that importers were not precluded from showing what the merchandise really was. In that holding the court was clearly correct. *United States* v. *Paul Puttmann*, 21 C. C. P. A. (Customs) 135, T. D. 46466, *United States* v. *Wo Kee & Co.*, 21 C. C. P. A. (Customs) 341, T. D. 46880, *United States* v. *Rotberg & Krieger*, 24 C. C. P. A. (Customs) 441, T. D. 48902.

The rules of law which will govern the decision of this case are clear and settled. Counsel for the Government concede in their brief that no question of commercial designation is involved here. Therefore, the common meaning of the term will control. *Armand Schwab & Co., Inc.* v. *United States*, 32 C. C. P. A. (Customs) 129, C. A. D. 296. The common meaning of a tariff term is a question of law for the court. *United States* v. *Shalom & Co.*, 33 C. C. P. A. (Customs) 29, C. A. D. 311. In determining the common meaning of tariff terms, courts may receive evidence as to such meaning, but such evidence is merely advisory to the court. *United States* v. *O. Brager-Larsen*, 36 C. C. P. A. (Customs) 1, C. A. D. 388. The courts are not bound by such testimony, but will ordinarily chiefly rely upon decisions of the courts and upon the definitions found in dictionaries and other lexicographical authorities. *United States* v. *Florea & Co., Inc.*, 25 C. C. P. A. (Customs) 292, 296, T. D. 49396.

If, however, the word in question has more than one common meaning, either of which may suitably fit the context, then the wording is ambiguous, and in the case of tariff acts resort may be had to the legislative history to determine the intent of Congress, *United States* v. *Jos. Riedel Glass Works, Inc.*, 32 C. C. P. A. (Customs) 201, C. A. D. 307, or in the case of trade agreements, to the trade agreement history to determine the intent of the negotiators, *United States* v. *Weigert-Dagen, et al.*, 39 C. C. P. A. (Customs) 58, 64, C. A. D. 464.

In the instant case, the court below found that the common meaning of the word "cured" as used in referring to meat was "preserved," and concluded that since the involved meat would not keep for more than a few days without refrigeration, it was not "preserved" and therefore not "cured."

In support of that conclusion the court made reference to many dictionary definitions and judicial interpretations. Other authoritative definitions are noted in the brief of appellee. Some of the dictionary definitions are as follows:

*Cure* * * * To prepare for keeping, by salting, drying, etc.; to preserve (meat, fish, fruit, tobacco, etc.). [*A New English Dictionary on Historical Principles*, 1893]

*Cure * * * To prepare for preservation by drying, salting, etc.: as, to cure hay; to cure fish or beef.*

> Who has not seen a salt fish thoroughly *cured* for this world, so that nothing can spoil it, and putting the perseverance of the saints to blush? *Thoreau*, Walden, p. 131. [*Century Dictionary and Cyclopedia*, 1911]

*Cure * * * To salt and dry (meat) for the purpose of saving or preserving it.* [*A Dictionary of American English on Historical Principles*, 1940]

*Cure * * * To put through a preserving process, as by salting, smoking, etc., or by drying; as, to cure hams; the grass must be thoroughly cured. * * * [In-transitive] To be preserved, as by drying.* [*Funk & Wagnalls New Standard Dictionary of the English Language*, 1942.]

*Cure * * * preserve (meat) by drying and salting.* [*Thorndike-Barnhart Comprehensive Desk Dictionary*, 1951]

*Cure * * * to prepare (meat, fish, etc.) for preservation by salting, drying, etc.* [*New Century Dictionary of the English Language*, 1952]

*Cure * * * to prepare for keeping; to preserve, as by drying, salting, etc.: as, to cure beef or fish; to cure hay.* [*Webster's New International Dictionary*, 1932]

The lower court also cited three cases in which the words "cured" or "curing" were discussed. *Florida Packing & Ice Co.* v. *Carney*, 51 Fla. 190, 41 So. 190 (1906); *Commonwealth* v. *Clark*, 344 Pa. 155, 25 A. 2d 143 (1942); and *Commonwealth* v. *Fried & Reineman Packing Co.*, 198 A. 801 (Pa. 1938).

All of the above authorities, plus many others which need not be reproduced here, tend to support appellees' contention that the common meaning of "cured" as applied to meat is "preserved." However, the list is not yet complete. In the second edition (1934) of the widely recognized *Webster's New International Dictionary* "cure" is defined as follows:

* * * To prepare for keeping *or use;* to preserve, as by drying, salting, etc.; * * * [Italics supplied.]

The meat involved here would be "cured" in the sense of being prepared for use.

In "Meat Hygiene" (1951), authored by Government's witness, Dr. Miller, the following appears, as quoted in the record:

> Curing. The salting of meats was done primarily to preserve them. Long before the development of the meat packing industry, meats were treated with salt solutions or packed in salt to keep them from spoiling so that they might be held for use at a later date. It was the common practice to salt meat produced during cold weather to hold it over for use in warmer seasons * * *.
>
> The consumer has developed a taste for salted meat, and the modern meat curing practices of the meat packing industry are aimed more at supplying the consumer with a product to satisfy his taste than a meat that has been salted for its preservation. * * *

In the *Encyclopedia of Chemical Technology* (1952), the following is stated under the heading "Meat and Meat Products" [Volume 8, page 829]:

## CURING OF MEATS

The original purpose of curing meat was to preserve the meat without refrigeration. The primary factor in preservation was the addition of salt. Throughout the succeeding centuries, various modifications and additions were made in the curing ingredients. Today the curing agents, in addition to salt, may include sodium nitrate and/or sodium nitrite (to render the color heat-stable), sugar, and spices. The products may be smoked and/or partially dried. With modern refrigeration there is no longer a need for salt in high concentration as a preserving agent; today salt is used in smaller amounts and chiefly for its flavor effects. The modern milder-cured products are made possible by rigid sanitation and thorough refrigeration during processing. They require refrigeration for preservation.

Curing is generally confined to pork and beef. Cured meats may consist of such cuts as hams, picnics, bellies (bacon), thigh muscles (dried beef), brisket (beef), or ground and comminuted meat. Many cured meats, like ham, bacon, and sausages, are smoked following curing. Cured comminuted meats may be processed into sausage or canned.

      \*        \*        \*        \*        \*        \*        \*

Curing processes vary considerably with the type of product and purpose of curing Hams and bacon for overseas shipment are given a higher salt cure than those for domestic use. Certain variations in processes are made to meet the preferences in different sections of the country.

However, the same authority under the heading "Salt" [Volume 12, page 81] states:

\* \* \* It is commonly used in *preserving* and *seasoning* foods such as in *curing pork and other meat products*, curing fish, making sauerkraut and pickles, preserving other vegetables, canning vegetables and meats, baking, and many other familiar household uses. [Emphasis added].

Upon a review of the authorities and the apparently conflicting testimony of the witnesses, the most accurate statement seems to be the following definition by the importers' witness Gilman:

The word "cured" apparently has several interpretations. One is that it is actually cured against spoilage. Another term in the packing house trade as to whether the additives have penetrated the product and means nothing more than that. In that case, if your additives were strong enough, and it had fully permeated the product, it would then be cured, but it wouldn't necessarily preserve it and keep it from spoiling.

The lower court recognized that there were two meanings for the word "cure" as used in connection with meat, but concluded that, "It seems clear that 'to preserve' is the older and more common meaning of the word 'cure' \* \* \*." We are not prepared to say that the lower court erred in so holding. However, we do not find it necessary to rest our decision on that ground. Whether or not the *only* common meaning of "cured" is "preserved," it certainly is *one* of the common meanings of the word as used in connection with meat. The authorities quoted, as well as our own understanding of the word, establish that much. The most we could concede to the Government

is that the meaning advocated by it is *another* meaning in common usage. Assuming, then, that both meanings of the word "cured" are acceptable, we must conclude that the terminology of the General Agreement is ambiguous, and under the rules set down above, resort must be had to such pertinent material as is available to determine the intent of the negotiators. When we do so, we find that the phrase "cured beef" as used in the General Agreement did not encompass merchandise of the type involved here.

Three trade agreements, in addition to the General Agreement, modified the duties on prepared or preserved meat under paragraph 706, so far as we are concerned here. These agreements are those with Argentina, T. D. 50504 (1941), Uruguay, T. D. 50786 (1942), and Paraguay, T. D. 51649 (1947). The wording of each of those agreements in modifying paragraph 706 is identical. (See the provision from the Paraguay agreement, quoted *supra*). The identity of terminology, combined with other circumstances showing similarity of conditions of these countries with respect to beef products, is sufficient warrant for treating the three agreements as a unit. Among the publications which this court has considered helpful in ascertaining the intent of trade agreement negotiators are the "Digests of Trade Data" prepared by the Tariff Commission from the information furnished to the "Trade Agreements Committee," the interdepartmental body charged with carrying out the trade agreements program. The digests prepared from material furnished for the negotiation of the Argentina agreement contain the following statement:

> The concession in the agreement with Argentina applied to prepared or preserved meats dutiable under paragraph 706 and reported under the following import classifications: (1) Canned beef, including canned corned beef; (2) pickled or cured beef and veal; and (3) canned meats not elsewhere specified, and prepared or preserved meats, not specially provided for, including liver paste. * * *
>
> *           *           *           *           *           *           *
>
> Under the category of beef and veal, pickled or cured, the chief product is beef pickled or cured in salt or brine *so that it may be kept for a long time with little or no refrigeration.* It is a cheap meat used especially for supplying ships, construction camps, and other places where refrigeration is inadequate or wholly lacking. Dried, sliced, or smoked beef is also included in this category. [Emphasis added].

Another group of publications which have been found helpful are the so-called "Analyses of General Provisions and Reciprocal Benefits" which have been released by the State Department, apparently as press releases, at the time of the signing of the various trade agreements. The "Analysis" for the Argentina agreement states in its introductory pages (as do most of the analyses), "This information has been prepared by representatives of the Department of State, the Department of Agriculture, the Department of Commerce, the Department of the Treasury, and the Tariff Commission. These Government agencies, under the Reciprocal Trade Agreements Pro-

gram, cooperate in the formulation, negotiation, and conclusion of all trade agreements entered into by the United States. * * *." The "Analysis" for the Argentina agreement contains the following statement with reference to "cured beef": .

> Beef and veal, pickled or cured—Pickled or cured beef and veal provide relatively cheap meat especially adapted for use as ship stores, and in situations where refrigeration facilities are inadequate. * * *

The "Analysis" issued for the Uruguay agreement contains substantially identical language.

Thus it appears that, although the term "cured beef" was not used in the text of Argentina, Uruguay, and Paraguay agreements, nevertheless one of the principal concessions was on "cured beef," which was considered to be meat which would keep a long time without refrigeration.

This discussion gives us the background preceding the negotiation of the General Agreement on Tariffs and Trade. Since the disputed term appears in that agreement, it is necessary to ascertain whether "cured beef" was given the same meaning by the negotiators as it had been given in the discussion of the earlier concessions.

The "Trade Agreement Digests, 1946" were prepared prior to the signing of the General Agreement, and bear the statement that they were "Prepared by the Tariff Commission for use in connection with trade agreement negotiations." In the "Summary Digest" on paragraph 701 (entitled "Live Cattle and Fresh, Chilled or Frozen Beef") appears the following:

> Paragraph 706 provides for beef and veal canned, cured, *or otherwise preserved;* with a minor exception these items are not under consideration for the current negotiations. The duty on these meats under the Tariff Act of 1930 was 6 cents per pound but not less than 20 percent ad valorem. By the trade agreement with Argentina, effective November 1941, the rate was fixed at 3 cents per pound but not less than 20 percent ad valorem. The imports of canned beef (principally corned beef) from Argentina and other South American countries have been a major item for some time past. [Emphasis added.]

The apparent equating of "cured" and "preserved" in this quotation, coupled with the reference to the Argentina agreement tend to indicate that the same meaning was intended in the 1946 digests as had been used in the Argentina digests, and, further, that the phrase "cured beef" had been used in the General Agreement to avoid granting additional concessions on the items for which concessions had been granted in the Argentina agreement.

Finally, to make the picture complete, the *Summaries of Tariff Information,* 1948, under the discussion of "Beef and Veal, Pickled or Cured (Par. 706)", appears the following:

> Pickled and cured beef is made from cuts of meat less readily "boned out" for sausage, and is put up in barrels *for use where refrigerated storage is lacking.* [Emphasis added.]

Thus, every aid to interpretation of the negotiators' intent that we have been able to find supports appellees' contention that the term "cured beef" as used in the trade agreement refers to meat which has been preserved for use where refrigerated storage is lacking. The appellant has not given us citations to any references on the intent of the negotiators, and we must assume that it was unable to find any contrary to those cited. We conclude, therefore, that the term "cured beef" as used in the General Agreement on Tariffs and Trade did not include meat of the character involved here, which would not be suitable in places where refrigerated storage is inadequate.

In response to a suggestion of a member of the court during oral argument, counsel for the parties examined copies of the familiar "Farmers' Bulletins" issued by the Department of Agriculture, and submitted supplemental memoranda thereon. However, as stated by counsel for the Government, "It is interesting to note that counsel for each side of the question presented here feels that the data contained in the Farmers' Bulletins referred to is indicative of the correctness of its argument." In view of this fact, we do not find it necessary to further discuss these bulletins. If these bulletins do make such use of the word "cure" that each party could find support therein, it merely leads to the conclusion that the word is ambiguous, and, as demonstrated above, ambiguity must be resolved against appellant.

For the reasons hereinbefore discussed, the decision of the United States Customs Court is *affirmed*.

JACKSON, Judge, retired, recalled to participate.

WORLEY, J., concurs in the conclusion.

JOHNSON, J., and JACKSON, J., dissent.