Slip Op. 04 - 82

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - -x

BESTFOODS,                              :

                    Plaintiff,   :

          v.                     :   Court No. 98-12-03230

THE UNITED STATES,                      :

                    Defendant.   :

- - - - - - - - - - - - - - - - - - x

                    Opinion

[Upon cross-motions as to class-
 ification of REDUCED FAT SKIPPY®,
 summary judgment for the defendant.]

                              Decided:  July 9, 2004


     Neville Peterson LLP (John M. Peterson, George W. Thompson and
Maria E. Celis) for the plaintiff.

     Peter D. Keisler, Assistant Attorney General; Barbara S.
Williams, Attorney-in-Charge, International Trade Field Office,
Commercial Litigation Branch, Civil Division, U.S. Department of
Justice (Amy M. Rubin); and Office of Assistant Chief Counsel,
International Trade Litigation, U.S. Bureau of Customs and Border
Protection (Yelena Slepak), of counsel, for the defendant.



          AQUILINO, Judge:  Notwithstanding provision for peanut

butter and paste *eo nomine* by a subheading (2008.11.02 et seq.

(1997)) of the Harmonized Tariff Schedule of the United States

("HTSUS") and *dictum* in Bestfoods v. United States, 260 F.3d 1320,

1322 (Fed.Cir. 2001), that "[p]eanut slurry and peanut butter are

classified under the same tariff classification, HTSUS 2008.11[]",

comes the plaintiff in this action with a motion for summary judgment, praying that its merchandise which it describes as "Skippy® brand reduced fat peanut butter spread, a peanut-flavored food preparation imported from Canada"[1], be classified as a nut puree or paste under HTSUS subheading 2007.99.65 or, alternatively, as a condiment per subheading 2103.90.90.

I

Plaintiff's motion, which is made pursuant to USCIT Rule 56, is accompanied by a requisite Statement of Material Facts As To Which No Genuine Issue Exists, to wit:

1.   The subject merchandise in its condition as imported is Skippy® reduced fat peanut butter spread, a peanut-flavored food preparation imported from Canada.  . . .

2.   The United States Food and Drug Administration (FDA) regulations, 21 C.F.R. §164.150, provide the standard of identity for "peanut butter", and require that, to be labeled and marketed as peanut butter, a product must have no more than 10% other ingredients in addition to its peanut material.

3.   The peanut spread contains approximately 40% additional ingredients, including hydrogenated vegetable oil, corn syrup solids, salt, sugar, and a protein/vitamins/mineral mix.  This product is not "peanut butter" according to the FDA standard of identity, 21 C.F.R. § 164.150.

4.   The FDA permits Bestfoods to market and label the subject merchandise as a "reduced fat peanut butter spread."

---

[1] Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment [hereinafter cited as "Plaintiff's Memorandum"], p. 2.

5.     . . . [E]ntry number 551-5501565-8 . . . was liquidated on April 10, 1998, and Customs classified the subject spread under . . . HTS[] subheading 2008.11.05 as peanut butter.

6.     Plaintiff timely protested the classification of the subject merchandise, asserting that it was classified under HTS subheading 2106.90.- 99, as other food preparations.  Upon denial of its protest, plaintiff timely filed this action.

7.     Plaintiff[] subsequently amended its claim, adding HTS subheading 2007.99.65[2], which pro- vides for nut purees and pastes, as an appro- priate heading for the classification of the subject spread.


In its response to this statement, the defendant admits paragraphs 4-6 and paragraph 7, save the "validity of the amended claim."  As for the first three averments, the defendant:

1.     Admits that the subject merchandise is Skippy[®] reduced fat peanut butter spread.  Denies that the subject merchandise is a peanut-flavored food preparation.  Avers that the subject merchandise is peanut butter or paste.  . . .

2.     Admits that the . . . FDA[] regulations, 21 C.F.R. § 164.150, provide the standard of

_____

    2 In its motion for leave to amend its complaint to add this alternative claim, the plaintiff cited Jarvis Clark Co. v. United States, 733 F.2d 873, reh'g denied, 739 F.2d 628 (Fed.Cir. 1984), to the effect that

    this Court has "the duty to find the correct answer by appropriate means" concerning the classification of mer- chandise, even though the arguably correct classification had not been raised before the trial court.  Thus, the Court has the ability to consider plaintiff's proffered alternative in any event.

    Presumably, this rule of law is the basis for suggesting the other, alternative classification (under HTSUS subheading 2103.90.90) in plaintiff's instant summary judgment motion.

identity for "peanut butter." Denies that the regulation requires that, "to be labeled and marketed as peanut butter, a product must have no more than 10% other ingredients in addition to its peanut material." Avers that the regulation provides that "seasoning and stabilizing ingredients do not in the aggregate exceed 10 percent of the weight of the finished food." Avers further that 21 C.F.R. §130.10(a) permits the use of a name of a standardized food to label a substitute food that does not comply with the standard of identity for the standardized food. Avers further that Customs does not have to follow the FDA regulations for purposes of classifying the imported merchandise under the HTSUS.

3.    Admits, except denies that the product contains approximately 40% of additional ingredients. Avers that the peanut butter spread contains approximately 34-40% of additional ingredients. . . . Avers further that the subject merchandise qualifies and may be labeled as a substitute peanut butter.

This response has been served and filed in conjunction with a cross-motion by the defendant for summary judgment that contains its own Statement Of Additional Material Facts As To Which There Are No Genuine Issues To Be Tried, namely:

1.    The imported product was invoiced as Skippy Reduced Fat Peanut Butter.

2.    The imported product is a peanut paste made primarily of peanuts with the addition of some other ingredients.

3.    The imported product looks, tastes and has the consistency of peanut butter.

4.    The imported product is advertised, marketed, sold, intended for use and used in the same manner as peanut butter.

5.    Dictionary definitions of the term "peanut butter" do not require that it contain more

than 90 percent peanuts by weight. Peanut butter is defined in the Oxford English Dictionary (Second Edition) . . . as "paste made with ground roasted peanuts," and in the Random House Dictionary for the English Language, (the Unabridged Edition 1969), p. 1060, as "smooth paste made from finely ground roasted peanuts, used as a spread or in cookery." Peanut butter is also described in the Encyclopedia of Food Technology at 683 . . . (1974)[] as "a cohesive, comminuted food product prepared by dry roasted, clean, sound, mature peanuts from which the seed coat and 'hearts' are removed, and to which salt, hydrogenated fat and (optional) sugars, antioxidants and flavors are added."

6.    The imported product is peanut butter pursuant to the common meaning of that term found in dictionaries.

7.    Peanuts (also known as ground-nuts) are legumes.

8.    Peanuts are not nuts botanically.

9.    The imported product is not made of nuts.

10.    The imported product is not a nut puree, nor a nut paste.

11.    The imported product is not a condiment.

The plaintiff denies defendant's foregoing paragraphs 6 and 9-11. As for the others, it responds as follows:

1.    Admits that the imported product was invoiced as "reduced fat peanut butter." However, avers that the product is labeled "reduced fat peanut butter spread" and cannot be sold in the United States as "peanut butter." Further avers that the entry for which the invoice was prepared was a related party transaction designed solely to invoke this Court's protest jurisdiction, and thus did not reflect the usual commercial practice.

2.    Admits that the importe[d] product is a peanut
      paste made primarily from peanuts.  Avers that
      the imported product also may be classified as
      a puree under the H[TSUS].  Further avers[]
      that approximately 60% of the imported product
      is made from peanuts and that the remaining
      40% of the product consists of hydrogenated
      vegetable oil, corn syrup, salt, sugar, and
      other sweeteners.

3.    Admits that the imported product resembles
      peanut butter.  Avers that even though the
      imported product looks like peanut butter, it
      may not be sold in the United States as peanut
      butter.

4.    Denies.  Avers that the subject merchandise is
      marketed and labeled as a "reduced fat peanut
      butter spread."

5.    Admits that the dictionary terms of peanut
      butter do not require that peanut butter
      contain more than 90 percent peanuts by
      weight.  Avers that the peanut butter industry
      is required to label products "peanut butter"
      only if they contain 90 percent or more of
      peanuts pursuant to the F[DA] standard of
      identity for peanut butter.

                        *   *   *

7.    Admits.  Avers that even though peanuts are
      legumes in their botanical definition they are
      considered nuts in the United States.

8.    Admits.  Avers that even though peanuts are
      not nuts in their botanical definition they
      are considered nuts in the United States.

Despite the foregoing differences between the parties over the facts, each side is of the view that summary judgment on its behalf would be appropriate as no genuine issue that requires a trial is joined.  See, e.g., Defendant's Cross-Motion for Summary Judgment, p. 1;  Plaintiff's Reply Memorandum, p. 4.  Having re-

viewed and considered all their motion papers and exhibits, and as discussed hereinafter, the court concurs that trial is not necessary.  The dispositive issues at bar are matters of law.

II

Jurisdiction over this action is pursuant to 28 U.S.C. §§ 1581(a), 2631(a).  It stems from rulings requested and received from the U.S. Customs Service by plaintiff's corporate predecessor, in particular HQ 959816 (Feb. 25, 1997), holding that plaintiff's product

> is classified . . . in subheading 2008.11.0500, HTSUS, if imported in quantities that fall within the limits described in additional U.S. note 5 to chapter 20, and dutiable at the 1996 general rate of duty of 1.3 cents per kilogram.  If the quantitative limits of additional U.S. note 5 to chapter 20 have been reached, the product will be classified in subheading 2008.11.1500, HTSUS, and dutiable at the 1996 general rate of 147 percent ad valorem.  In addition, products classified in subheading 2008.11.1500, HTSUS, will be subject to additional duties based on their value, as described in subheadings 9904.-20.01-9904.20.10, HTSUS (1996).

Defendant's Exhibit A, p. 5.

The core of the controversy then as now is that the product "may not meet the standard of identity of the . . . FDA[] for peanut butter".  Id. at 2.  To summarize plaintiff's argument renewed at bar, it is that the merchandise is not "peanut butter" in the commercial sense of that term. That foodstuff fails to meet the FDA's standard of identity for peanut butter and cannot be labelled or marketed as such in the United States.  The foregoing pre-entry ruling letter of Customs overlooked the question of

commercial designation and thus lacks persuasiveness on this central issue.  Plaintiff's Memorandum, pp. 6-7.  In short, for

> lack of thoroughness, failure to address commercial designation, inconsistency with prior rulings, and ab-sence of valid reasoning[,] *Ruling 959816* deserves no deference by this Court.

Id. at 16.

What the plaintiff is obviously seeking to undermine is that a Customs ruling like the foregoing "is eligible to claim re-spect according to its persuasiveness", United States v. Mead Corp., 533 U.S. 218, 221 (2001), citing Skidmore v. Swift & Co., 323 U.S. 134 (1944), based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  323 U.S. at 140.  This attempt by the plaintiff, however artful, does not achieve its goal in this court's opinion.

A

HQ 959816 appreciates that one of the purposes of FDA standards of identity "is to promote honesty and fair dealing in the interest of consumers by truthful and informative labeling of food products"[3] and also that such standards are "helpful in defining a product but . . . not controlling in determining [its] classification . . . under the H[TSUS]."[4]  See, e.g., Nestle Re-

---

[3] Defendant's Exhibit A, p. 4.

[4] Id.

frigerated Food Co. v. United States, 18 CIT 661, 666 (1994)("FDA standards of identity are not controlling for tariff classification purposes"), citing Charles Jacquin et Cie v. United States, 14 CIT 803 (1990); Alexandria Int'l, Inc. v. United States, 13 CIT 689 (1989); Joseph F. Hendrix v. United States, 82 Cust.Ct. 264, C.D. 4809 (1979).  Cf. United States v. Mercantil Distribuidora, S.A., 43 CCPA 111, 116-17, C.A.D. 617 (USDA regulation interpreting meaning of "cured beef" not binding for tariff purposes); Amersham Corp. v. United States, 5 CIT 49, 56, 564 F.Supp. 813, 817 (1983), aff'd, 728 F.2d 1453 (Fed.Cir. 1984)(rules and regulations to protect public safety not determinative of tariff classification disputes).  Indeed, as pointed out at the beginning hereof, the HTSUS subheading under review provides for peanut butter and paste *eo nomine*, which kind of provision has long been understood to encompass all forms of the substance within that nomenclature.

In addition to the red-faced REDUCED FAT SKIPPY® on the front label of plaintiff's 18-oz. jar, defendant's exhibit E, that exhorts would-be purchasers *cum* consumers to "SPREAD THE FUN!" a-top a depiction of swirls of the sticky stuff, that label emblazons "CREAMY Peanut Butter Spread" above "60% peanuts".  Customs reacted to this presentment in its ruling letter by pointing out that the FDA has a definition for "peanut spread" found in 21 C.F.R. §102.23 to the effect that the common or usual name of a spreadable peanut product with more than ten percent nonpeanut

ingredients "shall consist of the term 'peanut spread' . . .".[5]

Furthermore:

> . . . [A] peanut spread . . . and . . . peanut butter . . . both consist of roasted ground peanuts and both are spreadable by the consumer on bread, crackers, and biscuits.  We do not see a difference in calling a product peanut butter, peanut butter and paste, or a peanut butter spread for purposes of subheadings 2008.-11.02 and 2008.11.05, HTSUS.  The question is whether the product is classifiable under the tariff schedule as peanut butter and paste.  Counsel does not claim that the instant product is covered by the standard of identity for peanut spread.  This standard does not permit the product to be labeled as "Peanut Butter" or as a "Peanut Butter Spread".  The standard permits the product to be labeled as a "Peanut Spread", not as a Peanut Butter Spread.  Counsel does claim that the instant product does not meet the standard of identity for peanut butter in 21 CFR 164.150.  Yet, counsel states that his client has an agreement with FDA authorizing the labeling of the instant product as a "Peanut Butter Spread".  This is further evidence that the instant product is a modified form of peanut butter.  It is a contradiction to label a product as peanut butter, albeit, with the added word of spread, and contend that the product is not peanut butter.[6]

## B

Of course, as this agency reasoning recognizes, the enacted language of the subheading at issue includes the words "and paste", signifying something in addition to, or other than, the "butter" of the legume in question.  There is no indication of the intent of the legislature with regard to that addition and also no prescribed definition thereof.  Whereupon the court must determine its common meaning and "may consult dictionaries, lexicons, scien-

---

[5] Id., quoting 21 C.F.R. §102.23.

[6] Ibid.

tific authorities, and other such reliable sources"[7] in doing so. Opening Funk & Wagnalls Standard Dictionary of the English Language (Int'l ed. 1963) to page 923 reveals definition of the noun paste as, among others,

> [a]ny doughy or moist plastic substance; anything of the consistency of paste, as for consumption or application: usually with a qualifying word: fish *paste*; almond *paste*.

Italics in original. Definition **1d** of that noun in Webster's Third New International Dictionary of the English Language Unabridged, p. 1652 (1981) is "a smooth food product made by evaporation or grinding <almond ~> <tomato ~> <sardine ~>".  Cf. Plaintiff's Memorandum, pp. 18-19. There is no mention of butter[8] or peanut in any of the paste definitions in the two lexicons just quoted.  And, unlike the "butter" of peanuts, the record before the court does not refer to any particular standard peanut content to be a paste thereof.  Suffice it to thus state that this court is unable to conclude that the 60-or-more-percent peanut content of plaintiff's product herein[9] is insufficient to constitute peanut

---

[7] <u>Lonza, Inc. v. United States</u>, 46 F.3d 1098, 1106 (Fed.Cir. 1995), citing <u>C.J. Tower & Sons of Buffalo, Inc. v. United States</u>, 69 CCPA 128, 133-34, 673 F.2d 1268, 1271 (1982).

[8] Of course, the primary definition of this term is the fat of milk solidified via churning, although there is secondary reference to "butterlike" products made by grinding nuts, stewing fruits, etc.  <u>See</u>, <u>e</u>.<u>g</u>., Webster's New Collegiate Dictionary, p. 113 (1961).

[9] <u>Cf</u>. Affirmation of Stephan P. Lypinski, Jr., Plaintiff's Memorandum, Exhibit A, para. 9; Affirmation of Richard Wilkes, Plaintiff's Memorandum, Exhibit D, para. 6.

paste within the meaning of HTSUS subheading 2008.11.02 et seq. Cf. Plaintiff's Response To Defendant's Statement Of Material Facts As To Which No Genuine Issue Exists, para. 2, supra ("Admits that the importe[d] product is a peanut paste made primarily from peanuts").

### III

In deciding herein that Customs classified correctly plaintiff's merchandise, the court can confirm that it has considered able counsel's proposed alternative classification(s), namely, a nut puree or paste under HTSUS subheading 2007.99.65 or a condiment per subheading 2103.90.90, and has come to conclude that neither argument merits much response. With respect to the first proposed alternative, while the creator of the HTSUS has subdivided its chapter 20 into headings numbered, among others, 2007 and 2008, which are encaptioned, respectively, "Jams, fruit jellies, marmalades, fruit or nut pureé and fruit or nut pastes . . ." and "Fruit, nuts and other edible parts of plants . . . not elsewhere specified or included: Nuts, peanuts (ground-nuts) and other seeds . . ." and the prevailing concept of Nature's universe puts *Arachis hypogaea*, Latin for the primary plantstuff at bar, with a bean-pod or pea-pod[10], on its face the HTSUS does not.  That

---

[10] See, e.g., The Standard Cyclopedia of Horticulture, vol. III, p. 2505 (1935); Webster's New International Dictionary of the English Language Second Edition Unabridged, p. 1799 (1945).

is, the court can find that *Arachis hypogaea* is not genuinely a "nut"[11], but the HTSUS, heading 2008, not 2007, makes it the same as one for purposes of classification.

As for plaintiff's other proposed alternative, counsel adopt the definition of condiment in United States v. Schoenfeld & Sons, Inc., 44 CCPA 179, 181, C.A.D. 657 (1957), to wit:

> "Something used to give relish to food, and to gratify the taste; usually a pungent and appetizing substance as pepper or mustard; seasoning[,]"

quoting Webster's New International Dictionary of the English Language Second Edition Unabridged. Whereupon they argue that plaintiff's REDUCED FAT SKIPPY®

> gives flavor to all foods on which it is spread, particularly on breads, crackers, toast, etc., and it is a suspension of peanuts, oils, corn syrup, salt, and sweetener. Generally, consumers purchase the subject spread to make peanut butter sandwiches or to spread on crackers to create a flavorful snack or in some cases, a meal. Further, the peanut spread may be found in condiment aisles in the supermarket. In numerous East Asian cultures, the reduced fat peanut spread may even be used (as a healthier substitute for peanut butter) as a spice or flavorful addition to a chicken or fish, in a "satay" dish.

Plaintiff's Memorandum, pp. 22-23, citing Gassenheimer, Mahi-mahi makes flavorful peanut satay, Sodsook, Grilled Chicken Satay With Curried Peanut Sauce, and Veggies Unite!, Peanut Burgers with Satay

---

[11] See, e.g., Defendant's Statement of Additional Material Facts As To Which There Are No Genuine Issues To Be Tried, paras. 7, 8, supra; Plaintiff's Response To Defendant's Statement Of Material Facts As To Which No Genuine Issue Exists, paras. 7, 8, supra.

Sauce, together plaintiff's exhibit E thereto.  See also Jimtown

Store, Jimtown Fresh Condiments, Plaintiff's Reply Memorandum,

Exhibit C.  All this representation may well be true, but it cannot

and therefore does not trump the very first general rule of

interpretation ("GRI") of the HTSUS that, "for legal purposes,

classification shall be determined according to the terms of the

headings".  Can it realistically be said that heading 2103,

encompassing

> Sauces and preparations therefor; mixed condiments and
> mixed seasonings; mustard flour and meal and prepared
> mustard[,]

is the one which provides a more specific description of plain-

tiff's product within the meaning of the GRI than HTSUS heading

2008, supra?  Obviously not.

IV

In view of the foregoing, plaintiff's motion for summary

judgment must be denied, with defendant's cross-motion granted.

Summary judgment will enter accordingly.

Decided:  New York, New York
          July 9, 2004

                              Thomas J. Aquilino, Jr.
                                      Judge